**AMERICAN STANDARD INSURANCE COMPANY OF WISCONSIN, Plaintiff-Appellant,**

v.

**Claude Theodore RIDER et al., Defendants,**

and

**State Farm Mutual Automobile Insurance Company, Intervenor-Respondent.**

**No. 9067.**

Sprinfield Court of Appeals, Missouri.

Dec. 8, 1971.

Opinion Modified on Court's Own Motion and Motion for Rehearing or for Transfer to Supreme Court Denied Jan. 4, 1972.

Application to Transfer Denied Feb. 22, 1972.

Dewey Routh, Routh & Turley, Rolla, for plaintiff-appellant.

P. Pierre Dominique, Jefferson City, for intervenor-respondent.

HOGAN, Judge.

In this action for a declaratory judgment, plaintiff American Standard sought an adjudication that it was not obliged to defend certain actions for damages filed in the Circuit Court of Dent County. It appeals from an adverse judgment.

In barest sketch and outline, the background of the controversy is: That on October 31, 1967, a Mr. Ralph Rider made application to the plaintiff for an automobile liability policy covering a 1959 Lincoln Continental automobile. On November 1, 1967, plaintiff issued a policy to Mr. Rider covering the Lincoln, providing only insurance against liability for bodily injury and property damage, and uninsured motorist coverage as required by § 379.203.[1] The policy contained a so-called "automatic insurance" provision under section IV thereof, which defined the word "automobile" to mean:

"1. Described Automobile—The motor vehicle or trailer described in this policy . . . [and]

1. All references to statutes and rules are to R.S.Mo. (1969), V.A.M.S. and V.A.M.R., unless otherwise noted.

4. Newly Acquired Automobile—An automobile of the type described in this policy, ownership of which is acquired by the named insured (a) if it replaces an automobile owned by him and described in this policy, or (b) if an additional automobile, if the company insures all automobiles owned by him on the date of its delivery to him and (c) *he, in either case, notifies the company within 30 days following delivery date.* [Our emphasis.] The insurance with respect to any newly acquired automobile shall not apply to any accident or loss against which the named insured has other valid and collectible insurance.

As respects a newly acquired automobile which replaces an automobile owned by the named insured, such coverages under this policy which applied to the replaced automobile shall apply to such newly acquired automobile.

As respects a newly acquired additional automobile, only such coverages shall apply thereto as were, on the date of its delivery to the named insured, afforded by this company and common to all automobiles owned by him.

The named insured shall pay any additional premium required because of the application of this insurance to any such newly acquired automobile."

While the policy was in effect, in fact, on the day before its expiration, plaintiff's insured was involved in an accident while riding in an automobile owned by him but being driven by his brother, defendant Claude Theodore Rider. Plaintiff's insured was killed in the accident, as was the driver of the other car, and a passenger in the Rider vehicle was injured. A wrongful death action and an action for damages for personal injuries were subsequently filed against defendant Claude Rider, and this Mr. Rider claimed coverage under the policy issued by plaintiff to its insured, Ralph Rider.

Shortly after the accident occurred, plaintiff discovered that the automobile in which its insured was riding when he was killed was not the Lincoln covered by the policy, but a 1960 Ford stationwagon which the insured had acquired on November 14, 1967, and licensed on December 4 thereafter. Admittedly plaintiff never received any notice of its insured's acquisition of the Ford, either as a replacement for the Lincoln or as an additional automobile, and after investigating the accident plaintiff denied coverage on this ground. Plaintiff agreed to enter an appearance on behalf of defendant Claude Rider under a non-waiver agreement, which it did, and suggested to defendant Rider that he might have coverage under his wife's automobile liability policy, which had been written by intervening defendant State Farm Mutual Automobile Insurance Company. Thereafter, plaintiff filed this action, joining all the parties to the pending damage suits and its insured's administrator as defendants. State Farm was permitted to intervene upon its representation that it might become the primary insurer should the court declare and adjudge that plaintiff was not obligated to defend the pending wrongful death action and personal injury suit. A trial was had to the court without the intervention of a jury, and after hearing evidence, which we shall discuss more fully in the course of the opinion, the trial court made the following findings:

1. That the automobile described in the plaintiff's policy had been inoperable and had not been used by the insured for several months prior to the date of the accident and had never been restored to operating condition, but was, after the accident, sold for junk;

2. That the 1960 Ford was a "replacement" within the meaning of part IV (4) of plaintiff's policy;

3. That plaintiff's insured was the owner of the Ford and that defendant Claude Rider was operating the vehicle with the

insured's permission at the time of the accident;

4. That plaintiff's insured did fail to give plaintiff the 30-day notice required by the "automatic insurance" provision above quoted, but that plaintiff was not thereby prejudiced.

The court therefore declared that plaintiff was obligated by the terms of its policy to defend the actions pending against defendant Claude Rider.

One of the questions presented on this appeal is whether or not the 1960 Ford stationwagon was a "replacement" or a "newly acquired vehicle" within the meaning of part IV (4) of the policy. This issue was raised by the intervenor, who sought to show that the Lincoln covered by the policy was in reality both legally and mechanically inoperable at the time the insured acquired his Ford stationwagon, and at the time the accident occurred. In this connection, the intervenor had the evidence of one Wayne Barrett, who had "a little salvage yard" "across the road" from the insured's residence. Mr. Barrett bought the Lincoln "two, three or four weeks" after the insured was killed on April 30, 1968. Prior to the time Mr. Barrett bought the car, it had been sitting across the road from his salvage yard for five or six months. When Mr. Barrett bought the car "it wasn't in running condition," and it "seemed" to Mr. Barrett that one or two of the tires were flat. It had to be moved to Mr. Barrett's garage with a wrecker. Mr. Barrett further testified that he did not keep track of the insured's activity; that sometimes it was "three or four days" between trips to his salvage yard, but that the Lincoln "was sitting there in the same place all the time"; and that the insured had ". . . talked about having the car worked on up there at the garage," but Barrett had never discussed repair with the insured, because he, Barrett, didn't operate the garage. Mr. Barrett was unable to say where the Lincoln was "as of any particular date." The intervenor also produced records showing that the Lincoln was not licensed in 1967 or 1968, and it was stipulated that if the Ford was a "replacement" rather than a "newly acquired vehicle" and if notice of the acquisition of the Ford had been given, no additional premium would have been charged by the plaintiff for insuring the Ford rather than the Lincoln.

 The plaintiff and the respondent intervenor have extensively briefed and argued the difference between a "replacement" vehicle and a "newly acquired vehicle" in the context of policy provisions similar to those set forth in the plaintiff's policy. The law need not be discussed at length, for most of the precedents bearing on this point have been recently considered and distinguished in Beck Motors, Inc. v. Federal Mutual Insurance Company, Mo. App., 443 S.W.2d 200. As some of the authorities there noted indicate, a newly acquired vehicle may in some circumstances be a "replacement" even though the vehicle being replaced is retained by the insured. Two of the cases noted in the *Beck* opinion, Filaseta v. Pennsylvania Threshermen and Farmers' Mutual Casualty Ins. Co., 209 Pa.Super. 322, 228 A.2d 18, and Brescoll v. Nationwide Mutual Insurance Co., 116 Ohio App. 537, 189 N.E.2d 173, involve fact situations in which the listed vehicle was inoperable but capable of repair at the time the replacement was obtained. In both cases, the listed vehicle was subsequently repaired and its only use after being made operable was in connection with the sale of the vehicle. In *Beck*, the court concluded that for the automatic insurance provision to apply if the insured has two vehicles in possession, it is necessary that the newly acquired vehicle take the place of the described car and that the described car be treated thereafter so it is clearly apparent that it has been replaced and is no longer covered. Beck Motors, Inc. v. Federal Mutual Insurance Co., supra, 443 S.W.2d at 204–205[4]. With deference to the trial court, for whose judgment we have much respect, we cannot agree that the evidence in this case estab-

lishes that the Ford was intended to replace the Lincoln. Mr. Barrett did testify that when he drove to his salvage yard he saw the Lincoln "sitting by the little garage" across the road from his salvage yard, but it was also shown that Mr. Barrett did not go to his salvage yard every day and could not actually say that the Lincoln had been continuously parked in the same place without having been driven. Further, the record shows that the garage was located at the insured's residence, where one would expect to find his automobile parked. Mr. Barrett's testimony that the insured had "talked about having the [Lincoln] car worked on," in our opinion, tends to negate the conclusion that he intended to dispose of it and replace it, and the fact that it was mechanically inoperable when Mr. Barrett bought it some weeks after the insured's death does not indicate that it was inoperable and had not been in operation for a year and five months, as the respondent intervenor contends. There is no evidence whatever that the insured intended to dispose of the Lincoln; rather he retained possession and control of it up to the time of his death, and could, presumably, have put it to use if he so desired. Moreover, the insured's certificate of title to the Ford shows that he transferred the license to the Ford from a 1950 Chevrolet, which suggests that the insured may in fact have been the owner of several automobiles during the period in question. There was no surrender of a completely demolished automobile to a dealer for resale with the intention of purchasing a new vehicle as soon as the described vehicle was repaired, as was true in most of the cases cited by the intervenor; in our opinion, the case is similar in principle to Mitcham v. Travelers Indemnity Co., 4 Cir., 127 F.2d 27, in that the insured, as we have just said, retained control of the described vehicle and could have put it to use at any time, and the insurer could not have proved which vehicle was covered. In the circumstances presented, we believe and must hold that the evidence was insuffi-cient to show that the Ford was intended as a "replacement" for the Lincoln.

Another point for discussion is the effect of the insured's failure to give notice of his acquisition of the Ford as required by part IV (4) of the policy. Our courts, as the respondent intervenor recognizes, have consistently held that the notice provision in the automatic insurance clause of an automobile liability policy must be complied with, or there is no coverage of the replacement vehicle, assuming arguendo that the Ford was technically a "replacement." Mistele v. Ogle, Mo., 293 S.W.2d 330, 333[5]; Missouri Managerial Corporation v. Pasqualino, Mo.App., 323 S.W.2d 244, 248–249[3]; Union Automobile Indemnity Ass'n v. Reimann, Mo.App., 171 S.W.2d 721, 726[1]. There is no contention here that notice, oral or written, was given that plaintiff's insured had replaced his Lincoln with the Ford in which he was riding when he was killed. Records received by stipulation at the trial indicate that plaintiff's insured acquired the Ford on November 14, 1967, and licensed it on December 4, 1967, by transferring a license from a 1950 Chevrolet. The notice period is expressly stated here to begin to run when the replacement vehicle is "delivered" to the insured. The precise date of delivery is not in evidence, but in any event the notice period must be held to have commenced no later than December 4, 1967, and the casualty here involved occurred April 30, 1968, long after the time for giving notice had expired.

The trial court found that failure to give the required notice did not defeat coverage because there was no prejudice to the insurer, but here, again with deference, we believe the trial court was in error. It is true, as noted in Cockrell v. Farmers Mutual Automobile Ins. Co., Mo.App., 427 S.W.2d 303, 308–309[2], and the many cases therein discussed and analyzed, that our courts have been extremely reluctant to excuse an insurance carrier from its contractual obligation because of some breach of

condition which does not prejudice the carrier, and have held that the existence of prejudice or lack of it is usually a fact question. Nevertheless, not a single case among those ably and carefully discussed in the *Cockrell* opinion, including Meyers v. Smith, Mo., 375 S.W.2d 9, Winterton v. Van Zandt, Mo., 351 S.W.2d 696, and Walker to Use of Foristel v. American Automobile Ins. Co., 229 Mo.App. 1202, 70 S.W.2d 82, deals with or discusses the failure of the insured to give the notice required by the automatic insurance provision, and in our view the principles which govern the cases involving failure to give notice of claim or suit, or failure to cooperate in some manner, are not applicable here. The only Missouri cases we have found dealing with the notice requirement of the automatic insurance provision are Mistele v. Ogle, supra, 293 S.W.2d at 333[5], Missouri Managerial Corporation v. Pasqualino, supra, 323 S.W.2d at 248–249[3], and Union Automobile Indemnity Ass'n v. Reimann, supra, 171 S.W.2d at 726, which hold that unless notice of the acquisition of a replacement vehicle is given, coverage of that vehicle terminates at the end of the notice period.

■ If a finding of prejudice was material, we do not believe it could fairly be said that the insurer was not prejudiced, for as stated in Beck Motors, Inc. v. Federal Mutual Insurance Co., supra, 443 S.W.2d at 204[4], the automatic insurance provision is not intended to cover two vehicles for the premium of one. And, as noted, we do not believe the evidence fairly establishes that the insured's Lincoln was either mechanically inoperable or that he intended to dispose of it and replace it with the Ford. However that may be, we are of the opinion that prejudice to the insurer, in this case is immaterial. So far as we can determine, courts have unanimously rejected the argument that, when no notice is given and the casualty occurs after expiration of the notice period, the insurer must show some prejudice before it can deny liability. Though the rationale of the

cases may not be entirely satisfactory, the courts hold generally, and we believe, that the failure to give notice does not involve a breach of the policy perpetrated by the insured, but is merely a failure of the insured to perform a requirement necessary to gain coverage of a different vehicle. There is no question of discontinuing existing coverage, that is, forfeiture, because of some act by which the insured breaches his contract; rather, it is the insured's failure to do some act that is required to bring about coverage and the existence of a contract. Thus the breach cases are not in point, and prejudice to the insurer, or lack of it, is wholly immaterial. Metropolitan Casualty Ins. Co. of New York v. Buscher, D.C.Ill., 95 F.Supp. 500, 502[3]; Inghram v. Dairyland Mutual Insurance Company, Iowa, 178 N.W.2d 299, 303; Christiansen v. Moore, 184 Neb. 818, 172 N.W.2d 620, 622–623[1]; Carr v. State Farm Mutual Insurance Company, 115 N.J.Super. 103, 278 A.2d 239, 241–242[1]; Thompson v. Dairyland Mutual Insurance Co., 30 Wis.2d 187, 140 N.W.2d 200, 203[7] [8]; 7 Blashfield, Automobile Law and Practice, § 316.6, p. 672 (3rd ed. 1966).

Finally, we note that the respondent intervenor seeks to avoid the application of Mistele v. Ogle, supra, 293 S.W.2d at 333, Missouri Managerial Corporation v. Pasqualino, supra, 323 S.W.2d at 248–249, Union Automobile Indemnity Ass'n v. Reimann, supra, 171 S.W.2d at 726, and the principles we have just stated by arguing that the policy in suit was filed as proof of financial responsibility pursuant to the requirements of the Motor Vehicle Safety Responsibility Law, now Chapter 303. The gist of the respondent's contention is that the policy, having been filed as proof of financial responsibility under § 303.160(1), necessarily incorporates § 303.190, par. 6, subpar. (1), which provides:

"The liability of the insurance carrier with respect to the insurance required by this chapter [303] *shall become absolute whenever injury or damage covered by said motor vehicle liability policy occurs;*

said policy may not be cancelled or annulled as to such liability by any agreement between the insurance carrier and the insured after the occurrence of the injury or damage; no statement made by the insured or on his behalf *and no violation of said policy shall defeat or void said policy.*" (Our italics.)

The respondent intervenor argues that proper construction and application of the Safety Responsibility Law requires the conclusion that the rights of the persons injured are not the same as would otherwise be the case; rather, it maintains, the policy must be read to constitute a contract between the plaintiff and the State that the plaintiff was insuring an individual against all contingent liability provided for in the policy, subject only to plaintiff's right to cancel the policy on ten days' notice as provided by § 303.210. Particularly, and citing Farm Bureau Auto. Ins. Co. v. Martin, 97 N.H. 196, 84 A.2d 823, 29 A.L.R.2d 811, the intervenor contends that the italicized language of § 303.190 prevents plaintiff from asserting that lack of notice of the acquisition of the Ford constitutes a policy defense. Fair consideration of the point requires careful attention to the course of dealing between the plaintiff and its insured in this case.

Plaintiff and its affiliate, American Family Insurance Company, had dealt with the insured, Mr. Ralph Rider, for several years prior to the time the policy in suit was issued. Mr. Richard Calvin, a general agent for both plaintiff and American Family, revealed that in December 1965 the insured had made application to American Family for an automobile policy to cover a 1959 Lincoln Continental. Before the application reached the home office, the insured demolished the automobile. Thereafter, it came to the agent's attention that the insured "drank quite a bit or drank some." On March 14, 1966, the insured made a second application to Mr. Calvin, this time to insure another 1959 Lincoln Continental. On this occasion, Mr. Calvin placed the application with

plaintiff, which is actually a subsidiary of American Family for substandard risks. This second application bore the notation that the insured had been involved in a "wreck" and that on December 29, 1965, the insured had received a "ticket for careless driving $5.00." Nevertheless, a policy was issued and was in effect, according to Mr. Calvin, "at least three months." It was allowed to lapse for nonpayment of the premium. Again in August 1966, Mr. Rider made application for a policy covering the Lincoln, and another policy was issued, bearing the same number. It is not entirely clear from the record when this policy was issued; the application is dated August 6, 1966, but the obverse side of the application has been stricken over to show an effective date of August 7, 1966. Counsel for the intervenor referred to the second policy as having been issued on August 6, but the actual policy was not introduced in evidence. Intervenor's exhibit 2 (received by stipulation) indicates that the insured's driver's license was revoked on November 7, 1966, for a period of one year. This was either upon the expiration date of the second policy issued or one day thereafter.

On October 31, 1967, the insured again made application for a liability policy covering the Lincoln covered by the second and third policies, and on this application Mr. Calvin indicated that the insured had had a "wreck" (the first policy), had received a "ticket" for "careless driving," and had been convicted of "drunking driving" (sic) on November 7, 1966. Nevertheless, intervenor's exhibit 2 (a copy of the insured's driver's license ledger card from the files of the Department of Revenue) indicates that the conviction of drunken driving was entered on September 22, 1966, in Phelps County. No actual copy of any judgment of conviction under § 564.440 was entered in evidence. On this last application—dated October 31, 1967—Mr. Calvin did not bind the plaintiff, but sent the application forward, and a policy was issued, according to Mr. Calvin, on

November 1, 1967. The insured paid a three-month premium to Mr. Calvin, and thereafter paid another three-month premium directly to American Standard. This policy—the policy in suit—covered the Lincoln and provided insurance against liability for bodily injury and property damage in the amounts of $10M/$20M/$5M, and uninsured motorist coverage as required by § 379.203. A Mr. Holcomb, plaintiff's supervisor of litigation, testified positively that a new and different policy was issued to the insured on November 1, 1967, and that that policy—the one in suit—was not a mere renewal of the policy issued on August 6 or 7, 1966.

■ While we accord considerable respect to able counsel's presentation of this point, we believe his argument has somewhat outrun his proof. We do not find that § 303.190, or indeed the Safety Responsibility Act, has ever been fully or definitively construed, and we shall not undertake such a construction here. It is true that in many jurisdictions which have compulsory insurance laws, or motor vehicle responsibility laws, the rights of an insurance company to cancel or defend against a policy which has been given as proof of financial responsibility have been considerably restricted. See, e. g., 7 Blashfield, Automobile Law and Practice, § 272.6, pp. 32–33. Nevertheless, it is our view that if the restrictions imposed by § 303.190, par. 6, subpar. (1), are to be imposed in a particular case, it must be shown that the policy was actually certified as proof of financial responsibility. Empire Fire and Marine Insurance Co. v. Brake, Mo.App., 472 S.W.2d 18, 23–24[4]; Anderson v. Aetna Casualty and Surety Company, Tex.Civ.App., 432 S.W.2d 151, 155; 7 Appleman, Insurance Law and Practice, § 4297, p. 120 (2d ed. 1962). As pointed out by careful students of the subject, it is the actual certification of the policy which invokes the provisions of the Safety Responsibility Act. See Risjord &

Austin, "The Financial Responsibility Condition of the Automobile Liability Policy," 25 U.Kan.City L.Rev. 83, 84–85 (1957). Here, the record falls short of establishing that the policy in suit was ever certified to the Director of Revenue as proof of financial responsibility. Mr. Calvin was asked if he was aware that in *November* 1966 the insured's driver's license had been revoked, and he answered, "He told me at the time that he had to have an SR 22,"[2] but Mr. Calvin could not remember what he was told when application for the policy in suit was made on October 31, 1967. Mr. Calvin did answer "yes" to counsel's question whether the insured made application in October 1967 "so he could get his driver's license back," but the record is devoid of any direct proof that the last policy issued was ever certified as proof of financial responsibility. Whatever may be the proper construction and integration of the Safety Responsibility Act, the insured's driver's license ledger card shows only that his driver's license was revoked for a period of *one year* on November 7, 1966, following a conviction for "DWI" on September 22, 1966, and that his license was reinstated one year and six days after it was revoked. In the absence of direct proof that the last policy issued was actually certified to the Director of Revenue as proof of financial responsibility, that is, that an SR 22 was actually filed, we are unwilling to hold that the policy in suit was a certified policy, subject to the limitations and restrictions of § 303.190.

For the reasons indicated, the judgment is reversed and the cause is remanded, with directions to enter a judgment declaring that plaintiff is not obligated by the policy in suit to defend the actions pending against defendant Claude Theodore Rider, being causes numbered 7487 and 7488 now pending in the Circuit Court of Dent County, Missouri.

TITUS, P. J., and STONE, J., concur.

---

2. That is, that proof of financial responsibility pursuant to § 303.160(3) was required.